**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| CHERYL BALL, *individually and on behalf of the* ESTATE OF JAMES MICHAEL BALL, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 2:16-cv-00041-DCN |
| vs. | ) ) | **ORDER** |
| USAA LIFE INSURANCE COMPANY, | ) ) | |
| Defendant. | ) ) | |

The following matters are before the court on defendant USAA Life Insurance Company's ("USAA") motion for summary judgment, ECF No. 65, plaintiff Cheryl Ball's ("plaintiff") motion for partial summary judgment, ECF No. 69, and plaintiff's motion in limine. ECF No. 70. For the reasons set forth below, the court grants in part and denies in part USAA's motion for summary judgment, denies in full plaintiff's motion for summary judgment, and grants in part and denies in part plaintiff's motion in limine.

## I.  BACKGROUND

Plaintiff alleges that her husband, James Michael Ball ("Ball"), served in the Army for 27 years prior to retiring from active duty. Compl. ¶ 4. Ball applied for life insurance with USAA on April 17, 2012, id. ¶ 5, and on April 18, 2012, Ball completed a medical questionnaire via telephone with a representative of USAA, ECF No. 75 at 1. During this questionnaire, Ball disclosed a number of medical symptoms he had experienced and treatments he had undergone—including acid reflux,

esophagus and stomach examinations, gallstones, gallbladder problems, digestive problems, laparoscopic surgery, and an EKG.  Id. at 2.  Ball also notified USAA of the location of his medical records, and signed a "HIPPA COMPLIANT" Authorization form, allowing USAA to obtain said medical records in order to evaluate his eligibility for a life insurance policy.  Id.  USAA did not conduct any additional investigation into Ball's medical history, and Ball was approved and received two life insurance policies on May 20, 2012.  Compl. ¶ 5.

On December 13, 2013, Ball was killed in a hit and run motor vehicle accident.  Id. ¶ 6.  After Ball's death, plaintiff submitted a claim for life insurance benefits.  Id. ¶ 7.  USAA responded with a letter explaining that because Ball's death occurred within the two year "contestability period" it would need to review Ball's medical history and the circumstances surrounding his death before making a coverage decision.  ECF No. 75-1, Claim File at 29–30.  On November 25, 2014, USAA notified plaintiff that it was denying coverage and would seek to rescind the two policies based on "multiple omissions and misstatements" contained in Ball's applications for life insurance.  Id. at 36.  USAA specifically noted Ball was asked whether he had ever consulted with a health care provider for[] [s]eizures, paralysis, stroke, depression, anxiety, or other mental or nervous system disorder (sic)," to which Ball answered, "no."  Id. at 36.  Ball also failed to disclose his treatment for "depression, PTSD, sleep apnea, memory problems/headaches and traumatic brain injury" when he was asked if he had "consulted a health care professional for any reason not previously disclosed."  Id. at 37.  At the time, USAA was aware that Ball had received treatment for an episode of "Major Depression" on August 11, 2010.

ECF No. 79 at 7–8.  Further discovery has revealed that Ball received treatment for a variety of mental health-related issues from January 2008 until around May 2012. See ECF No. 65-1 at 4–8 (summarizing Ball's treatment history).  USAA has maintained that it has the right to rescind the policies based on Ball's failure to disclose this treatment during the telephone interview.

Plaintiff filed her complaint on October 27, 2015 in the Court of Common Pleas for Dorchester County, bringing the following causes of action:  (1) breach of contract; (2) insurance bad faith; and (3) attorney's fees pursuant to South Carolina Code § 38-59-40.  USAA filed a notice of removal on January 7, 2016.  The parties filed cross-motions for summary judgment on April 21, 2017.  ECF Nos. 65, 69. Plaintiff also filed a motion in limine to exclude expert testimony the same day.  ECF No. 70.  The parties filed their respective responses to all three motions on May 5, 2017, ECF Nos. 73–75, and their replies on May 12, 2017.  ECF Nos. 77–79.  The matters are now ripe for the court's review.

## II.  STANDARD

### A.      Rule 702 and Daubert

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

District courts serve as gatekeepers for expert testimony. The court has a "special obligation" to ensure that expert testimony is relevant and reliable. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147 (1999).

Under <u>Daubert</u>, the court must address two questions: first, whether the expert's testimony is based on "scientific knowledge"; and second, whether the testimony "will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592. The first question is answered by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." <u>Id.</u> at 592–93. Several factors should be considered when determining the reliability of a particular scientific theory or technique: whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has attained general acceptance in the pertinent scientific community. <u>See</u> <u>id.</u> at 593–94. In considering these factors, the focus "must be solely on principles and methodology, not on the conclusions that they generate." <u>Id.</u> at 595. These factors are not exclusive; what factors are relevant to the analysis "depends upon the particular circumstances of the particular case at issue." <u>Kumho Tire</u>, 526 U.S. at 150.

The second inquiry "goes primarily to relevance." <u>Daubert</u>, 509 U.S. at 591. Relevance is determined by ascertaining whether the testimony is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute. <u>Id.</u> at 593. "A review of the caselaw after <u>Daubert</u> shows that the rejection of expert

testimony is the exception rather than the rule."  Fed. R. Evid. 702 advisory committee's note to 2000 amendments.  "Daubert did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'"  Id. (quoting United States v. 14.38 Acres of Land Situated in Leflore Cnty., 80 F.3d 1074, 1078 (5th Cir.1996)).

### B.     Motion for Summary Judgment

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support

the non-moving party's case.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).

The non-movant must then "make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden

of proof at trial."  <u>Id.</u> at 322.  The court should view the evidence in the light most

favorable to the non-moving party and draw all inferences in its favor.  <u>Anderson</u>, 477

U.S. at 255.

### III.   DISCUSSION

**A.      Motion in Limine to Exclude DiLisio's Testimony**

Plaintiff moves to exclude the testimony of USAA's claims procedures expert,

Robert DiLisio ("DeLisio").  To understand plaintiff's objections to DeLisio's

testimony, it is important to understand the context of this testimony.  Plaintiff has

brought a bad faith claim based on USAA's refusal to pay benefits under the policies.

"An insured may recover damages for a bad faith denial of coverage if he or she

proves there was no reasonable basis to support the insurer's decision to deny benefits

under a mutually binding insurance contract."  <u>Cock-N-Bull Steak House, Inc. v.

Generali Ins. Co.</u>, 466 S.E.2d 727, 730 (S.C. 1996) (quoting <u>Dowling v. Home

Buyers Warranty Corp.</u>, 400 S.E.2d 143, 144 (S.C. 1991)).  USAA has identified

DeLisio as an expert in insurance claims handling and offers his testimony to

demonstrate "the reasonableness of the procedures employed by USAA [] in regard to

[p]laintiff's claim for benefits."  ECF No. 73 at 3.  Though the parties have only

provided a portion of DeLisio's initial and supplemental reports, ECF Nos. 70-1, 70-

2, DeLisio's offered the following opinions during his deposition:

(1) "[T]he telephone interview process was reasonable."

(1) "USAA's performance of a contestability investigation was reasonable and consistent with industry standards[,] custom[,] and practice."

(2) "[T]he time period required in this case to complete the investigation was reasonable."

(3) "[USAA's] communications with [plaintiff] . . . met or exceeded industry standards[,] practice[,] and custom."

(4) "[I]t was reasonable for USAA to determine that [the misrepresentations contained in Ball's answers during the telephone interview] were material."

(5) "USAA had a reasonable basis to conclude that they were intentional."

(6) "[I]n my opinion, they got it right, that he, Mr. Ball, did intend to deceive."

ECF No. 73-1, DeLisio Dep. 40:16–17, 51:10–53:8. DeLisio also responded to certain opinions offered by plaintiff's expert, Stephen Burgess ("Burgess"), explaining that: (1) Ball should not be excused for his misstatements based on USAA's conduct; (2) even if Ball had been uncertain about certain questions, his failure to provide full disclosure should not be excused; (3) USAA should not be criticized for failing to tell Ball that it would not be obtaining his medical records during the initial investigation; (4) USAA conducted a "fair" contestability examination. Id. at 53:9–55:21.

Plaintiff seeks to exclude DeLisio's testimony because, in her view, a number of his opinions fall outside the scope of his "specialized knowledge, skill, experience, training[,] or understanding." ECF No. 70 at 1. Specifically, plaintiff argues that DeLisio has no expertise in the area of life insurance applications, life insurance underwriting, the materiality of different health conditions, or Ball's intent. Id. at 4–

18.  USAA takes the position that DeLisio is qualified to offer opinions of the claims investigation process, which necessarily touches on issues relating to the application process, underwriting, and intent.  ECF No. 73 at 2–5.  USAA urges the court to hold that DeLisio's lack of expertise in with any of these indirectly related issues goes to the weight, rather than admissibility, of his testimony.  Id. at 5.

First, it should be noted that DeLisio is clearly qualified to offer an opinion on the reasonableness of USAA's claims procedures.  "[A] witness['s] qualifications to render an expert opinion are [] liberally judged by Rule 702.  Inasmuch as the rule uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed:  knowledge, skill, experience, training, or education."  Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993).  "Accordingly, a challenge based on lack of qualifications alone must demonstrate that 'the purported expert [has] neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered.'"  SAS Inst., Inc. v. World Programming Ltd., 125 F. Supp. 3d 579, 586 (E.D.N.C. 2015) (quoting Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989)).  "If, again in the disjunctive, the proposed testimony will recount or employ 'scientific, technical, or other specialized knowledge,' it is a proper subject."  Kopf, 993 F.2d at 377.

DeLisio has a long history in the insurance industry.  His work has focused on the claims process, counseling claims examiners, reviewing and analyzing pending claims, managing claims that were in litigation, and even running a disability claims department for a time.  ECF No. 70-1, DeLisio Report at 2–5.  Plaintiff points out that the majority of DeLisio's experience has come from work on disability insurance

claims, but the record shows that DeLisio also engaged in significant work on life insurance claims. His duties involved working on life insurance claims from 1992 to 1994 as claims counsel for Monarch Life Insurance Company, and as a Second Vice President and Associate General Counsel at MassMutual from 1999 until 2005, when he began working as an expert witness. Id. DeLisio estimates that he has been involved in the review or analysis of around 500 life insurance claims throughout his carrier—as compared to around 1,200 disability insurance claims. ECF No. 73-2, DeLisio Aff. ¶ 3. He further estimates that he has worked on around 150 to 200 cases involving a decision to rescind a policy, about 75% of which involved life insurance policies. Given DeLisio's long history in the insurance industry, and the fact that a significant portion of that work involved life insurance claims, he possesses sufficient "knowledge, skill, experience, training, or education" to offer an opinion on the core issue of "the reasonableness of the procedures employed by USAA [] in regard to [p]laintiff's claim for benefits." ECF No. 73 at 3.

But DeLisio goes beyond discussing the reasonableness of the procedures and offers opinions on the reasonableness of a number of the conclusions USAA reached during the claims process. Many of these conclusions clearly implicate issues involving the underwriting process or the evaluation of Ball's intent. USAA argues that the court need to inquire into DeLisio's qualifications to address these issues based on the "well-settled" principle "that gaps in an expert's knowledge generally go to the weight of the witness's testimony, not its admissibility." N.O. v. Alembik, 160 F. Supp. 3d 902, 908 (E.D. Va. 2016). But this principle only applies to "gaps" that fall within the scope of an expert's area of expertise; it does not allow an expert who

9

is qualified in one area to ignore the scope of his qualifications and characterize his lack of qualifications as a mere "gap" in his knowledge. Indeed, it is equally well-settled that "an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise." Ruark v. BMW of N. Am., LLC, 2014 WL 351640, at *3 (D. Md. Jan. 30, 2014). The issue, then, is whether (1) DeLisio's opinions on the application process, the underwriting process, and Ball's intent fall within the scope of his expertise in the area of claims handing, or (2) DeLisio possesses some other experience that gives him expertise in the relevant area.[1]

As noted above, the parties have not provided DeLisio's actual reports. Therefore, the court's analysis of his opinions is confined to the conclusions and explanations offered in his deposition.[2] The court addresses each one in turn.

### 1. Telephone Interview Process

Plaintiff first attacks DeLisio's conclusion that the "telephone interview portion of the application process was reasonable." ECF No. 70 at 5. Plaintiff points out that DeLisio has never been licensed to sell or authorized to issue life insurance policies, and argues that his experience in the disability line of business does not qualify him to opine on the application process used for life insurance policies. Id.

"When an expert relies 'solely or primarily on experience,' . . . the Daubert inquiry becomes whether the expert can 'explain how that experience leads to the

---

[1] Plaintiff also argued that portions of DeLisio's testimony are not based on any expertise at all, and are therefore unhelpful to the jury. These arguments simply restate the basic issue of whether DeLisio exceeded the scope of his area of expertise.
[2] The court has not endeavored to address every opinion discussed in the deposition. It addresses only those opinions that plaintiff has objected to.

conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" Watkins v. Cook Inc., 2015 WL 1395773, at *13 (S.D.W. Va. Mar. 25, 2015) (quoting Fed. R. Civ. P. 702 advisory committee notes). DeLisio has successfully shown how his prior experience supports his opinion that the telephone interview process was reasonable.

As discussed above, the focus of DeLisio's career was the claims administration process. The application process is obviously a separate component of the business. However, DeLisio avers that his experience in the claims process frequently required him to evaluate the underlying policy application and application process. DiLisio ¶ 5. In fact, DiLisio contends that he has conducted such a review in a number of cases involving an insurer's decision to rescind a life insurance policy—the exact situation presented by this case. Id. ¶ 4. If this were not enough, DiLisio explains in his report that he served on the senior management board at Massachusetts Mutual Life Insurance Company from 1996 until 1999, where he was "required to have an in-depth knowledge of all aspects of the disability insurance line of business." DeLisio Report at 4. One would expect an "in-depth knowledge of all aspects" of the line of business to include knowledge about the application process. Of course, DeLisio did not deal with life insurance claims when he worked on the senior management board. Thus, DeLisio must show that his knowledge of the disability application process is transferable to a life insurance context before the court can consider his opinion on the matter. This final link is made by DeLisio's affidavit, where he explains that "[t]he application process for life insurance is very similar to the application process for disability insurance, particularly with respect to

the evaluation of the risk presented by various health-related events and conditions."
DeLisio Aff. ¶ 6.

When all of this evidence is put together, the basis for DeLisio's opinion becomes clear—DeLisio is relying on his knowledge of the disability insurance application process to opine on the adequacy of USAA's life insurance application process because he believes those processes are comparable. Perhaps one might quibble with how DeLisio knows that those processes are comparable, but plaintiff has not done so here, and even if she had, that type of objection seems more appropriate for cross-examination because the underlying assumption that life insurance processes are similar to disability insurance processes can be proven or disproven in a rather straightforward manner. Therefore, the court allows DeLisio to testify on this issue.

### 2. Underwriting Process

Plaintiff also objects to various aspects of DeLisio's testimony that touch on the underwriting process. ECF No. 70 at 6–9. At various points during his deposition, DeLisio addressed the process USAA's underwriters used in evaluating Ball's risk and suggested that this process was reasonable. DeLisio Dep. 76:13–77:6, 133:1–17. USAA argues that DiLisio's experience in claims handling qualifies him to analyze "any underwriting issues that arose in the processing of [p]laintiff's claim for life insurance benefits." ECF No. 73. This argument would make sense if DiLisio's work in the claims process would have required him to evaluate the reasonableness of the underwriting processes. But USAA has provided no evidence that this is the case, and frankly, it seems unlikely that claims evaluators would

review the processes used to underwrite the policy.  While claims evaluators may communicate with underwriters and ask how certain concealed facts might impact the underwriting process, that does not mean they have sufficient knowledge of the process to evaluate its reasonableness.  Thus, DiLisio's experience in the claims department does not give him a basis to opine on the reasonableness of the underwriting process.

Still, one might argue that the court could use the same reasoning outlined in Section III.A.1., above, to find that DeLisio's experience on the senior management board at Massachusetts Mutual Life Insurance Company gave him specialized knowledge about the underwriting process because he was "required to have an in-depth knowledge of all aspects of the disability insurance line of business."  DeLisio Report at 4 (emphasis added).  However, while DeLisio avers that the application process for disability insurance is comparable to the application process for life insurance, he explains that the underwriting processes for each type of policy are not so interchangeable.  See DeLisio Dep. 109:25–110:10 ("Q: . . . Would you distinguish life insurance underwriting from other types of underwriting?   A. Oh, for sure; for sure.  Disability insurance, for instance, underwriting includes income, salary information, which may not be  included in life insurance underwriting.  So there are variations.  Life insurance is a particular kind of underwriting but -- shares some similarities with other types of business, but also has its own unique process.").  Furthermore, DeLisio explicitly stated that he is not an expert in underwriting.  Id. at 133:1–2 ("I'm not offering any expert testimony as an underwriter.").  Instead, DeLisio explains that he evaluated the underwriter's testimony "in light of [his]

knowledge and experience," but also "deferred" to the underwriter when the issue exceeds his knowledge or experience. Id. at 133:3–8. The problem with this explanation is that it leaves the court without any way of knowing the degree to which DeLisio was relying on his experience to evaluate the underwriter's testimony, as opposed to simply "deferring" to the underwriter. This is even more concerning given DeLisio's suggestion that his knowledge of the underwriting process in the disability insurance context is not particularly transferable to the life insurance context. Because the court cannot even determine whether DeLisio's evaluation of USAA's underwriting process is based on his prior experience or his deference to USAA's underwriters, and because there is reason to question whether his prior experience is even applicable, the court prohibits him from testifying on the underwriting issue.

### 3. Cause and Effect of Medical Conditions

Plaintiff also seeks to prohibit DiLisio from testifying "as to his personal knowledge of the actual medical conditions involved in this life insurance claim." ECF No. 70 at 10. During his deposition, DeLisio was asked about his understanding of certain medical conditions. He answered, and twice indicated that he had only a "layperson's" understanding of the condition in question. DeLisio Dep. 82:11–16, 92:8–21. It is not clear that DeLisio even intends to explain various medical conditions to the jury. He may have simply been answering the questions asked of him during the deposition. Nevertheless, the court finds that DeLisio is not an expert on the nature or symptoms associated with medical conditions. Indeed, he admits that he is not even an expert in the insurance risk associated with specific medical

conditions.  Id. at 81:4–12 ("Q. What effect does sleep apnea have on someone's rating for risk for mortality?  A. The underwriters would be the best persons to answer that. The claims people normally don't assign the actual risk or assess the degree of risk. That's purely underwriting.  And I'm not offering opinions as an expert on underwriting. So I relied on the testimony of the underwriters.").  Thus, the court sees no reason to allow DiLisio to discuss particular medical conditions during his testimony.

### 4.     Materiality

Plaintiff also asks the court to prohibit DiLisio from testifying on the issue of materiality.  ECF No. 10.  DiLisio opines that "it was reasonable for USAA to determine that [the misrepresentations contained in Ball's answers during the telephone interview] were material."  DiLisio Dep. 52:6–9.  Again, USAA argues that DiLisio's experience in the claims process provides a sufficient basis for this opinion.  ECF No. 8.  To be sure, in any decision to rescind a policy based on misrepresentations contained in the application, the company will need to evaluate the materiality of those misrepresentations—at least, this is the case under South Carolina law.  Thus, it would not be surprising to learn that DiLisio had conducted such an evaluation in the past, or at least understood the ways in which the evaluation was supposed to be conducted.  If DiLisio then drew on that experience and applied it to the instant case, he would certainly be permitted to opine on the reasonableness of USAA's materiality evaluation in this case.

But DiLisio's testimony quite candidly reveals that he did not do so here. Instead, he stated that he determined that USAA's conclusion that Ball's misrepresentations were material was a reasonable one because:

> He had a history and a diagnosis of medical treatment for sleep apnea. He had a history of -- a diagnosis and treatment for TBI, memory problems and headaches. He had a history of diagnosis and treatment for depression. He had received a diagnostic testing which he did not disclose. And those omissions were reviewed by an underwriter who applied the company's guidelines and the guidelines set forth in the Swiss Re Underwriting Manual, which, in my experience, is a -- I recognize that manual by name. It's a very commonly used underwriting manual. It allowed the underwriters to utilize a points system to assess mortality risk. And the underwriter explained -- he came up with 250 points, which was 50 more than the maximum allowed for issuance of a policy. I think he testified that 200 points would be the maximum, and that would represent three times normal mortality. And based on this history, he came up with a rating of 250. So it wasn't really a close -- it didn't sound like a close call. It sounded like an obvious -- that sounded like obvious support for the conclusion by USAA that the omissions and misrepresentations were material.

DiLisio Dep. 79:4–80:3. In other words, DiLisio found USAA's materiality conclusion to be reasonable because USAA's underwriter found the misrepresentation to be material using the company's guidelines and the Swiss Re Underwriting Manual (the "Swiss Manual"). As an initial matter, it is clear that DiLisio did not conduct his own evaluation. Thus, he does not appear to know whether the underwriter correctly applied the company guidelines or the Swiss Manual. Instead, he assumes the guidelines were applied correctly and relies on the fact that the Swiss Manual is "commonly used" to find that the decision was reasonable. Of course, the Swiss Manual was only one of the tools used in the evaluation. DiLisio does not appear to be familiar with USAA's company guidelines. Ultimately, DiLisio's answer reveals that he did not actually evaluate whether

USAA's conclusion was a reasonable one. At best, he evaluated whether the process used to reach that conclusion was a reasonable one. The distinction is significant, as the law allows an insured to recover bad faith damages where there is no "reasonable basis" for denying coverage. Cock-N-Bull Steak House, 466 S.E.2d at 730. An insurer is not excused simply because it used "reasonable processes," if it nevertheless reached an unreasonable conclusion.

Therefore, DiLisio is precluded from opining that USAA was reasonable in concluding that Ball's misrepresentations were material. Should DiLisio wish to testify that the process USAA used to reach its conclusion was material, he may do so.

### 5. Ball's Intent

Plaintiff last seeks to exclude DiLisio's testimony regarding Ball's intent. For USAA to rescind the policy in this case, it must show, inter alia, that "the statement was made with the intent to defraud the insurer." Primerica Life Ins. Co. v. Ingram, 616 S.E.2d 737, 739 (S.C. Ct. App. 2005). DiLisio offers two opinions that touch on this issue. The first is that it was reasonable for USAA to conclude that Ball's misrepresentations were intentional. DiLisio Dep. 52:17–21. The second is DiLisio's opinion that this conclusion was not only reasonable, but correct—i.e., DiLisio offers a direct opinion on Ball's intent. Id. at 53:6–9. USAA argues that DiLisio's evaluation of Ball's intent falls within the scope of his expertise in the area of insurance claim evaluations. ECF No. 73.

Again, a review of DiLisio's deposition reveals that he did not rely on any sort of specialized knowledge or expertise. DiLisio explains that he based his opinions on the fact that:

> [Ball] cherry-pick[ed] [] the information he wanted to disclose or he did disclose; for instance, he disclosed colds and earache and gallbladder, but he didn't disclose other more serious conditions, which you would expect a reasonable person, certainly someone who, as Mrs. Ball testified, is as educated and detail-oriented as Mr. Ball, you would expect him to appreciate the significance of those other more serious conditions and to remember them. I think that's evidence of intent.

DiLisio Dep. 84:8–18. DiLisio further explains that he did not regard the question in the phone interview to be vague, based on his reading of the questions and the manner in which Ball answered the questions on the tape. Id. at 86:6–9 ("[I]t sounded to me like he paused after each question and listened to the question and then gave his response, which, to me, suggested a thoughtful approach to answering."). The court fails to see how any of this analysis requires any sort of expertise. DiLisio's analysis is based on his expectation of how a "reasonable person" would act. He contends that when a person only reveals the less serious conditions, one can infer that the more serious conditions were concealed intentionally. This is easy enough for a lay person to understand. DiLisio also contends that the tone and demeanor of Ball's responses suggests he was acting thoughtfully and deliberately. Again, these are classic jury determinations.

Because the court fails to see why the jury needs an expert to evaluate either Ball's intent or the reasonableness of USAA's evaluation of Ball's intent, it prohibits DiLisio from addressing either issue.

**B.    Motions for Summary Judgment**

The court now turns to the motions for summary judgment. Plaintiff argues that USAA is either estopped from offering a defense of rescission or has waived the right to use that defense. Plaintiff also contends that any misrepresentations Ball made were not incorporated into the contract and therefore cannot justify USAA's decision to rescind the contract. USAA contests each of these assertions and claims that it has proven its rescission defense as a matter of law. USAA also argues that, even if the court will not rescind the contract, it should at least grant summary judgment on plaintiff's bad faith claim, as the evidence shows that USAA had a reasonable basis for denying coverage. The court addresses each issue in turn.

## 1.    Estoppel

Plaintiff argues that USAA is estopped from rescinding the policies because USAA falsely represented to Ball that it would conduct its own investigation into Ball's medical history, leading Ball to think that if he simply made his medical records available and was then offered a policy, he could rest assured that his policy would not be rescinded for failure to disclose pertinent medical information. ECF No. 69-1 at 7.

"Equitable estoppel occurs where a party is denied the right to plead or prove an otherwise important fact because of something which he has done or failed to do." Parker v. Parker, 443 S.E.2d 388, 391 (S.C. 1994).

> The essential elements of equitable estoppel are divided between the estopped party and the party claiming estoppel. [] The elements of equitable estoppel as related to the party being estopped are: (1) conduct which amounts to a false representation, or conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention that such conduct shall be acted upon by the other party;

19

and (3) actual or constructive knowledge of the real facts. The party asserting estoppel must show: (1) lack of knowledge, and the means of knowledge, of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change of position in reliance on the conduct of the party being estopped.

Strickland v. Strickland, 650 S.E.2d 465, 470 (S.C. 2007).

There is reason to question whether plaintiff's estoppel argument is even legally cognizable. Generally speaking, when an insurer asks an applicant a question about a specific issue, "and the insurer has the right to rely upon the answer" and is "under no duty to investigate [its] truthfulness." Gov't Emp. Ins. Co. v. Chavis, 176 S.E.2d 131, 134, 137 (S.C. 1970); Darwin Nat. Assur. Co. v. Matthews & Megna LLC, 36 F. Supp. 3d 636, 643 (D.S.C. 2014) ("Generally, 'an insurer is entitled to rely on an applicant's answers to specific questions [in an Insurance Application]; it has no obligation to make an independent inquiry as to their truth.'" (quoting Am. Centennial Ins. Co. v. Sinkler, 903 F. Supp. 408, 411 (E.D.N.Y. 1995) (interpreting South Carolina law)). Thus, it has been held that an insurer's failure to make such an inquiry constitutes neither a waiver nor an estoppel. Chavis, 176 S.E.2d at 137. Plaintiff essentially argues that this general rule should not control in a situation where an insurer represents to the applicant that it will not rely solely on the applicant's answers.

USAA appears to suggest that an insurer has an absolute right to rely on answers given in a policy application, such that an insurer can never be estopped from rescinding the policy based on misrepresentations contained in the application. ECF No. 74 at 4. The court is hesitant to adopt USAA's broad reading of the law. The bulk of the cases USAA cites for support do not discuss the situation presented here,

where the insurer is alleged to have represented to the applicant that it would not rely on his answers.  E.g., Chavis, 176 S.E.2d 131; see also PHL Variable Ins. Co. v. 2008 Christa Joseph Irrevocable Trust ex rel. BNC Nat. Bank, 782 F.3d 976, 980 (8th Cir. 2015) (simply holding that, under Minnesota law, an insurer has no "duty to reasonably investigate the facts stated in a policy application"); Reliastar Life Ins. Co. v. Laschkewitsch, 2014 WL 2211033, at *8 (E.D.N.C. May 28, 2014) (holding that insurer did not waive the right to rescind the policy where, "on several occasions," the insurer "was placed on inquiry notice of fraud, but each time, defendant sufficiently covered his tracks so as to stop the inquiry at an early stage").  USAA does cite the case of Pierce v. United Home Life Ins. Co., 914 F. Supp. 2d 826, 830 (S.D. Miss. 2012), which held that an insurer was entitled to rely on an insured's answers in the application, even when the insured provided a medical release which "permitted an investigation that would have revealed that certain responses in the application were false."  This case is factually similar to the case at hand, but the legal analysis provides little support for USAA's broad interpretation.  The Pierce court focused on the fact that the medical release gave the insurer the ability to discover the misrepresentations in the application; it did not discuss, or even appear to consider, whether an insurer could voluntarily undertake a duty to investigate the applicant's representations.

It is unnecessary to adopt such a broad holding in this case, as the facts clearly show that USAA did not undertake such a duty.  The only evidence that even suggests that USAA represented that it would investigate Ball's medical history comes from the HIPPA Authorization form Ball signed at the time he submitted his

application, which states that "I understand the information obtained with this Authorization <u>will</u> be used by USAA [] to determine my eligibility for life insurance." ECF No. 74-1, HIPPA Authorization Form (emphasis added).  It is true that the HIPPA Authorization form uses the verb "will," but on the same day Ball executed the form, he participated in the telephone interview, during which USAA's representative explicitly told him that:  "USAA Life Insurance Company <u>may</u> need to review your medical records to better evaluate your application and to assign the best possible risk plans to your policy.  Medical records will be ordered <u>at the discretion</u> of the life insurance underwriter evaluating the application."  ECF No. 74-3, Interview Tr. 18:4–10 (emphasis added).  When these statements are read together, it is clear that plaintiff's motion for summary judgment on the estoppel issue must fail, as a reasonable juror could certainly find that USAA made it clear that it would not <u>necessarily</u> review the medical records.[3]

---

[3] Indeed, these statements support granting USAA, rather than plaintiff, summary judgment on the estoppel issue.  Here, where the USAA representative expressly stated that USAA would only order the medical records "at its discretion," the court is unwilling to find that USAA even made a false representation by providing a HIPPA Authorization form. And even if the HIPPA Authorization form could be considered a false representation, plaintiff has made no effort to explain how USAA intended for this representation to be acted upon by Ball.  <u>Strickland</u>, 650 S.E.2d at 470.  The only plausible reason that an insurance company would assure its applicants that it would check up on their answers is to ensure that they gave complete and accurate answers.  It would not do so with the intention that its applicant provide incomplete or false information, which is what happened here.  The court refuses to allow an applicant to use an insurer's promise to conduct an investigation to benefit from his misrepresentations by holding the insurer to the facts it would have discovered had it conducted such an investigation.  Equitable estoppel is, after all, an equitable doctrine.  <u>Gaymon v. Richland Mem'l Hosp.</u>, 488 S.E.2d 332, 333 (S.C. 1997) ("[A] defense of equitable estoppel interposed in a law case should be tried by the court as an equitable issue.").

## 2. Waiver

Plaintiff next argues that USAA has waived the right to rescind the policies based on Ball's misrepresentations because USAA chose not to use review Ball's medical records. ECF No. 69-1 at 10. However, this argument has been squarely dealt with in <u>Chavis</u>. There, the Supreme Court of South Carolina addressed an insured's claim that his insurer waived the right to rescind his policy by failing to investigate representations made in the application, where an investigation would have revealed that the representations were false. <u>Chavis</u>, 176 S.E.2d at 136 ("It is argued that all of the information upon which the appellant seeks to rescind its policy was readily available to it by making inquiry of the State Highway Department, at a cost of $1.00, and such would have revealed the traffic charges against Chavis and his false answers in his application."). The <u>Chavis</u> court recognized that the misrepresentations would have been revealed by a rather simple investigation, but held that an insurer's duty to investigate does not depend on whether it <u>could</u> have discovered the true information. <u>Id.</u> at 136–37 ("The rule sanctioned by most of the courts is that where one party to a transaction induces the other party to enter into it by willful misrepresentation, he cannot escape liability for his fraud by showing that such party could have investigated the representations made and would then have found that they were untrue."). Instead, an insurer's duty to investigate is only triggered when the application gives the insurer reason to inquire further. <u>See</u> <u>id.</u> ("The fact that Chavis was unmarried, under 24 years of age, lived in a rural section drove about 35,000 miles a year, and was requesting a liability policy with the limits above stated, could not impute knowledge to the appellant of his driving record nor

did such require an inquiry to be made thereabout."); see also Rutherford v. John Hancock Mut. Life Ins. Co., 562 F.2d 290, 293–94 (4th Cir. 1977) ("[T]he critical factor upon which a duty of further inquiry must be based is not simply the means to inquire, but the existence of a reason for doing so.") (applying North Carolina law). The fact that Ball provided USAA with a HIPPA Authorization form and directed USAA to the location of his medical records goes to USAA's ability to conduct an inquiry, but it does not show that USAA had any reason to do so.

Plaintiff also attempts to argue that because Ball disclosed some of his medical history, USAA was obligated to conduct an inquiry into his medical history, which would have revealed the treatments he failed to discuss. ECF No. 78 at 4–5. Plaintiff has presented some evidence that USAA's own underwriting guidelines would have called for further investigation of the portion of his medical history that he chose to disclose. See ECF No. 75 at 22 (discussing plaintiff's expert's opinion that USAA should have obtained records based on Ball's medical disclosures).[4] Plaintiff's argument attempts to apply the concept of constructive notice. Constructive notice is notice that is "imputed to a person whose knowledge of facts is sufficient to put him on inquiry; if these facts were pursued with due diligence, they would lead to other undisclosed facts." Anderson v. Buonforte, 617 S.E.2d 750, 755 (S.C. Ct. App. 2005). Plaintiff's underlying assumption is that "due diligence" required USAA to comply with its own underwriting guidelines, but this is a somewhat strange concept. The only reason the underwriting guidelines would

---

[4] The court notes that this section of the brief was redacted.

require further investigation is to more fully assess the risk associated with the medical conditions Ball actually disclosed. USAA certainly had no reason to believe that Ball might have concealed his medical treatments. Thus, to hold that USAA was on constructive notice of the concealed treatments would be to hold that (1) USAA cannot simply base its assessment of risk on whatever medical conditions Ball disclosed in his application without further inquiry, and (2) USAA's constructive notice as to potential issues with the disclosed conditions also imputes knowledge of any non-disclosed conditions. The court refuses to do so.

Since the fact that USAA is alleged to be "on notice" of is entirely unrelated to the fact it would have been inquiring into, the constructive notice concept is inapplicable here. Accordingly, the court denies plaintiff's motion for summary judgment on this issue, as there is at least a dispute of fact as to whether USAA failed to act with "due diligence" in relying solely on the answers in the application.

### 3.    Parol Evidence

Plaintiff also argues that it is entitled to summary judgment because the alleged misrepresentations were not made part of the contract, and are therefore barred by the parol evidence rule. Not so.

The policies each state that "[t]he entire contract consists of: [1] This policy; [2] Any application (including supplemental applications or reinstatement applications), amendment, rider, endorsement or revised POLICY INFORMATION page(s) which are attached or sent to Your last known address." Claim File at 8, 19. Ball's answers during the phone interview were reduced to a Medical Questionnaire, which is attached to the policies. Id. at 22. Notably, the Medical Questionnaire states

that it "must be completed to acquire life insurance."  The Medical Questionnaire also includes the following language above Ball's signature:

> I have read the above statements and answers and represent that they are true and complete and correctly recorded.  I agree that such statements and answers <u>shall be part of the application</u> and are made with the expectations that USAA LIFE INSURANCE COMPANY will consider the information when determining whether to issue the policy of contract for which I have applied.

<u>Id.</u> at 23 (emphasis added).

Plaintiff argues that because the policies do not reference the Medical Questionnaire, the Medical Questionnaire is not a part of the policies.  But it is fairly clear from the language outlined above that the Medical Questionnaire was considered to be an "application" under the policies, and the policies incorporated any "applications" that were attached.  "When a contract is unambiguous, clear, and explicit, it must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary, and popular sense."  <u>Sifonios v. Town of Surfside Beach</u>, 777 S.E.2d 425, 428 (S.C. Ct. App. 2015) (quoting <u>S.C. Dep't of Transp. v. M & T Enterps. of Mt. Pleasant, LLC</u>, 667 S.E.2d 7, 13 (S.C. Ct. App. 2008)).  The court finds that the policies unambiguously incorporate the Medical Questionnaires.

Plaintiff also highlights certain language in USAA's underwriting manual that states that "[q]uestionnaires conducted over the telephone are not part of the voice authorization process and are NOT made part of the contract; thus they are NOT contestable."  However, this is also parol evidence.  "Where a written instrument is unambiguous, parol evidence is inadmissible to ascertain the true intent and meaning

26

of the parties." In re Estate of Holden, 539 S.E.2d 703, 708 (S.C. 2000).  Thus, the

language in USAA's underwriting manual is entirely irrelevant.

Plaintiff is not entitled to summary judgment based on its argument that the

Medical Questionnaire is not part of the policies.  Nor is this argument sufficient to

preclude summary judgment for USAA, because there is no dispute of fact as to

whether the Medical Questionnaire was part of the policies.

### 4.	Rescission of the Policies

USAA argues that it is entitled to rescind the policies based on Ball's

intentional failure to disclose his treatment for depression and PTSD when he was

asked whether he had ever consulted with a health care provider for depression, or for

any other mental disorder.  ECF No. 65-1 at 2.  "In order to rescind an insurance

policy on the ground of fraudulent misrepresentation, the insurer must show by clear

and convincing evidence: (1) the statement was false; (2) the falsity was known to the

applicant; (3) the statement was material to the risk; (4) the statement was made with

the intent to defraud the insurer; and (5) the insurer relied on the statement when

issuing the policy." Primerica Life Ins. Co., 616 S.E.2d at 739.  The parties do not

really dispute the first two or the last of these factors.[5]  Therefore, the court only

---

[5] Plaintiff does argue that Ball did not know his statement was false, in the
sense that he did not think he had depression at the time of the statement and any
prior mental health issues were limited in nature.  First, Ball was not asked whether
he had depression at the time; he was asked whether he had "ever consulted with a
helath care provider for . . . depression . . . or other mental or nervous system
disorder."  Claim File at 16.  Thus, Ball's belief that he did not have any depression at
the time would not have given him reason to conclude that his answer was anything
other than false.  In any event, the crux of plaintiff's argument appears to be that Ball
did not realize he was being deceptive, which goes to his intent, rather than his
knowledge that his statement was false.

27

addresses whether there is evidence that Ball's statement was material and whether it was made with the intent to defraud USAA. It finds that the answer to both of these questions is no, and therefore denies USAA summary judgment on this issue.

### i. Materiality

A misrepresentation is material if a reasonable person would conclude that it is likely to influence the insurance company's assessment of the risk, thereby affecting the decision to provide coverage, or the terms on which such coverage is provided. S. Farm Bureau Cas. Ins. Co. v. Ausborn, 155 S.E.2d 902, 908 (S.C. 1967) ("A representation is material when the insured knows or has reason to believe that it will likely affect the decision of the insurance company as to the making of the contract of insurance or as to its terms."); see also Chavis, 176 S.E.2d at 133 ("A misstatement of material facts by the applicant takes away [the insurer's] opportunity to estimate the risk under its contract.").

USAA's principal underwriter Peter Morris ("Morris") avers that if USAA had known about Ball's history of treatment for depression, it would not have offered Ball the same "preferred ultra" premium rate. ECF No. 67-9, Morris Aff. ¶ 4. USAA argues that it is entitled to summary judgment based on Morris's testimony because "the uncontroverted testimony of an insurance company underwriter is 'sufficient to demonstrate the materiality of the misrepresentation.'" ECF No. 65-1 at 17 (quoting Darwin Nat. Assur. Co. v. Matthews & Megna LLC, 36 F. Supp. 3d 636, 651 (D.S.C. 2014)). The problem for USAA is that Morris's testimony is not uncontroverted. Plaintiff's expert, Burgess, was asked what USAA would have done if it had had all of Ball's medical records at the time Ball submitted the applications. Burgess

explained as follows: "I can't speak to what USAA would have done. I can tell you that based on my experience of issuing — being involved in the issuance of thousands of insurance policies, it's very likely that they would have issued him at the exact rating that USAA gave him." Burgess Dep. 184:1–5. Burgess went on to explain that "based on the [Swiss Manual] that I looked at and applied to the information that was given to me and my experience in the life insurance industry and the examination that was done by [Ball] . . . the industry would have look[ed] at [Ball's] complete underwriting file and issued the PUL rating to him." Id. at 184:10–16.

USAA contends that Burgess's testimony cannot be considered because Burgess can only speculate as to what USAA would have done. ECF No. 79 at 6. But this argument misunderstands the standard of materiality. Materiality does not directly depend on what an insurer would do with a given piece of information; it depends on what a reasonable person would <u>think</u> the insurer would do with that information. Thus, materiality is only indirectly tied to what USAA would have actually done. If an insurer has some atypical sensitivity to certain types of risk that a reasonable person would not be able to anticipate, that subjective sensitivity is not enough to establish materiality—unless a reasonable person would have known about it, which seems unlikely.

Therefore, there is a genuine issue of fact as to whether Ball's misrepresentation was material.

### ii.    Intent

"[T]he intent with which representations or misstatements of facts are made is a thing that is locked up in the heart and consciousness of the applicant. It may be

shown by his express words, or it may be deduced from his acts and the facts and circumstances surrounding the making of the misrepresentations, though on this question the mere signing of the application containing the answers alleged to be false is not conclusive." Peterson v. First Health Life & Health Ins. Co., No. 2:09-cv-00029, 2010 WL 2723113, at *7 (D.S.C. July 9, 2010) (quoting Johnson v. New York Life Ins. Co., 164 S.E.2d 175 (S.C. 1932)).  Courts have shown a willingness to resolve the issue of intent at summary judgment when "there is no other reasonable or plausible explanation for the applicant's false representation." Scottsdale Ins. Co. v. Collins, No. 2:11-cv-2622, 2012 WL 2389976, at *5 (D.S.C. June 25, 2012) (quoting Floyd v. Ohio Gen. Ins. Co., 701 F. Supp. 1177, 1190 (D.S.C. 1988)).

There is certainly plenty of evidence that Ball intended to deceive USAA when he failed to disclose his treatment for depression and PTSD.  USAA outlines the rather extensive history of Ball's treatment on pages 4 through 9 of its brief. Suffice it to say, Ball saw numerous professionals and received significant treatment for mental health issues in the period between 2008 and 2011.  Moreover, on May 3, 2012, mere weeks after completing his application with USAA, Ball reported a "diagnosis of post traumatic stress disorder," "mood swings," "anxiety," and "depression" during an examination at the Veterans Administration Medical Center in connection with his claim for disability benefits.  ECF No. 66-11, VA Exam Forms 5, 7–9.

However, there is at least some evidence that Ball did not intend to deceive USAA.  During the telephone interview, Ball told USAA's representative where his medical records could be found.   Interview Tr. 10:16–25, 19:22–20:5.  Concededly,

this was in response to questions posed by USAA's representative, but Ball even went so far as to tell USAA's representative where his files could be found and where his files might be found. Id. at 19:22–20:5 (stating that files were located at the National Personal Records Center and volunteering that additional files might be found in Fort Hood). It is curious why an applicant who was attempting to deceive an insurer would offer information on where additional files might be found. Indeed, if Ball were trying to deceive USAA, one might question why he even told USAA's representative where his records were located at all. Perhaps he felt he had to give them an answer to their question, but this requires a bit of speculation.

The problem with this evidence is it does not help explain why Ball failed to disclose his prior treatment for depression and PTSD, and plaintiff has not offered a particularly cogent theory either. Plaintiff has submitted some evidence which suggests that Ball's mental health issues were related to temporary stressors, including a work place conflict and a phase of life adjustment as he approached retirement. ECF No. 75 at 10. Thus, plaintiff appears to argue that Ball simply did not consider his previous treatment to be a significant issue. This view is indirectly bolstered by Burgess's testimony on the issue of materiality. If a reasonable person would not think that that Burgess's treatment history would impact USAA's decision to insure him, or the coverage he would be able to obtain, then it is difficult to see what motive Ball would have had to lie.

Of course, Ball was not asked whether he had undergone significant mental health treatment; he was asked whether any such treatment existed. Because it seems that Ball must have known his answer was false, it is difficult to imagine why Ball

would have given a false answer if he did not possess an intent to deceive. Based on the record before the court, USAA's argument is stronger—but it still does not meet the "clear and convincing" evidence standard necessary to rescind a policy. Therefore, the court finds that there is a genuine issue of fact as to whether Ball intended to deceive USAA by withholding information about his treatment for PTSD and depression.

### 5. Bad Faith

USAA last argues that it is at least entitled to summary judgment on plaintiff's bad faith claim. To recover under a bad faith claim, the insured must prove that the insurer had no reasonable basis to deny coverage. Cock-N-Bull Steak House, 466 S.E.2d at 730. Thus, if the insurer was at least reasonable in concluding that the insured's claim should be denied, the insured's bad faith claim cannot survive.

Here, USAA argues that it was reasonable to think that Ball made a fraudulent and material misrepresentation. Plaintiff does not dispute this,[6] but instead argues that her expert, Burgess, has identified "numerous violations of industry standards committed by USAA." ECF No. 75 at 15. However, none of these violations of industry standards relate to the claims review process. Instead, they relate to the application process. Thus, plaintiff's argument for summary judgment on the bad

---

[6] Plaintiff briefly argues that much of USAA's evidence of Ball's intent comes from records obtained after USAA made its coverage decision. Because an insurer's liability for a bad faith claim "must be judged by the evidence before it at the time it denied the claim," Howard v. State Farm Mut. Auto. Ins. Co., 450 S.E.2d 582, 584 (S.C. 1994), this would pose a problem for USAA's summary judgment argument. However, in its reply brief, USAA has identified a medical document it relied on at the time it denied plaintiff's claim, which indicates that Ball was diagnosed with depression and was taking anti-depressant medication in August of 2010.

faith claim is tied to its previous arguments for estoppel and waiver—in plaintiff's view, if USAA failed to complete a reasonable investigation of Ball's medical history during the application process, then it would be unreasonable for USAA to deny Ball coverage based on information that USAA should have obtained previously.

This is certainly a unique argument because it is not really based on USAA's evaluation of Ball's conduct. Instead, the idea is that USAA acted unreasonably by trying to enforce rights against that it had either waived or was estopped from enforcing. There is nothing fundamentally wrong with this theory of bad faith—there may well be situations in which it is unreasonable for a party to attempt to enforce a right that has clearly been waived. But the facts do not show such unreasonableness in this case. For the reasons discussed above in sections III.B.1 and III.B.2, it is not especially obvious that USAA's right to deny coverage was waived or estopped. Thus, it was at least reasonable for USAA to believe it had the right to rescind the policy. Therefore, the court grants USAA summary judgment on the bad faith claim.

## IV.   CONCLUSION

For the foregoing reasons, the court **DENIES** plaintiff's motion for summary judgment, **GRANTS IN PART AND DENIES IN PART** USAA's motion for summary judgment, and **GRANTS IN PART AND DENIES IN PART** plaintiff's motion in limine.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 18, 2017**
**Charleston, South Carolina**